## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FMD RESTORATION, INC.,

      Plaintiff,

  v.

BAISTAR MECHANICAL, INC., et al.,

      Defendants.

Civil Action No. 13-00651
DAR

BAISTAR MECHANICAL, INC., et al.,

      Counterclaim Plaintiff,

  v.

FMD RESTORATION, INC.,

      Counterclaim Defendant.

## MEMORANDUM OPINION

Plaintiff and Counterclaim Defendant, FMD Restoration, Inc. ("FMD"), is a Virginia

corporation engaged in the business of providing construction services, including plumbing,

electrical, heating/ventilation/air-conditioning, site concrete and other related construction

services.  Complaint, ECF No. 1, ¶¶ 1-2.  Defendant and Counterclaim Plaintiff, Baistar

Mechanical, Inc. ("Baistar"), is a Virginia general contractor and government services

corporation.  *See* Counter-Complaint, ECF No. 5-1, ¶¶ 1-2.  Baistar was the prime contractor for

three renovation projects at the Armed Forces Retirement Home ("AFRH") in Washington,

District of Columbia.  *See* Baistar's Amended Pretrial Statement, ECF No. 22 at 1.  Baistar

entered into three subcontracts with FMD which required FMD to perform construction and

landscaping services at the AFRH.  *See* Counter-Complaint ¶¶ 4 – 11.

FMD alleged that Baistar breached the three subcontracts and refused to pay for work

which FMD performed.  *See* Complaint ¶¶ 11-50.  Baistar alleged that FMD ceased to work on

the projects and that consequently, Baistar missed its own deadlines.  *See* Counter-Complaint ¶¶

8-11.


**Procedural History**

On May 7, 2013, FMD filed a Complaint against Baistar and the sureties which provided

payment bonds in accordance with the Miller Act, alleging three counts of breach of contract

with respect to the Sheridan Assisted Living Project ("Sheridan Project") (Count I), the Eagle

Gate Renovation Project (Count II) and the Quarter 40 Smoking Shelter Project (Count III).  *See*

*generally* Complaint ¶¶ 11 -49.  FMD sought judgment against Baistar in the amount of $60,000,

plus interest and costs, and for such other and further relief as this court may deem just and

proper.  *Id.* at 10.

Baistar denied FMD's claims and filed a counterclaim alleging breaches of contract for

the Sheridan Project (Count I) and the Eagle Gate Project (Count II), and tortious interference

with Baistar's business expectations of more construction work at the AFRH facility (Count III).

Baistar's Counter-Complaint ¶¶ 12 - 54.  Baistar asked that the court enter judgment against

FMD for compensatory damages in the amount of $340,000, plus lost profit "or an amount to be

determined at trial"; (Count I); compensatory damages in the amount of $50,000, plus lost

expectation profit "or an amount to be determined at trial[,]" (Count II); and compensatory

damages in the amount of $250,000 and punitive damages (Count III).  *Id.*; *see also id.* at 8-9

(explaining "lost expectation/profit damages" in the amount of $250,000 as to Counts I and II).

On December 5, 2013, the parties consented to proceed before the undersigned United

States Magistrate Judge for all purposes.  *See* Notice, Consent, and Reference of a Civil Action

to a Magistrate Judge, ECF No. 18; *see also* Referral, ECF No. 19.

**The Bench Trial**

The bench trial commenced on May 20, 2014 and concluded on May 23, 2014.

05/20/2014; 05/21/2014; 05/22/2014; 05/23/2014 Minute Entries.  During the bench trial, the

court heard testimony from (1) Franki Gaspar, owner of FMD; (2) Andrew Gaspar, president of

FMD; (3) Hung Ku Jun, owner of Baistar, and (4) Israel Cruz, a replacement subcontractor for

Baistar and former subcontractor for FMD, who uses the company name Delmy General

Construction, LLC.  *See* Trial Tr. vol. 1, ECF No. 35, 13, 90, 136 (Franki Gaspar), 150, 183

(Andrew Gaspar); Trial Tr. vol. 2, ECF No. 34, 61, 140 (Hong Ko Jun), 110, 121, 137 (Israel

Cruz); Trial Tr. vol. 3, ECF No. 36, 3, 45, 152, 162, 165 (Hong Ko Jun), 84, 114 (Franki

Gaspar), 120, 145 (Andrew Gaspar).

On May 21, 2014, at the close of FMD's case-in-chief, the court heard Baistar's oral Rule

52(c) Motion for Judgment as a Matter of Law, and granted the motion based upon the finding

that FMD failed to offer evidence sufficient for the court to find that FMD is entitled to recover

with respect to its claims.  *See* 05/21/2014 Minute Entry; *see also* Trial Tr. vol. 2, ECF No. 34,

53-55.  The court confined its findings to issues regarding the sufficiency of the evidence.  Trial

Tr. vol. 2, ECF No. 34, 53.   In that respect, the court found that the only reasonable inference to

be drawn from the evidence offered by FMD is that FMD acknowledged that it did not complete

the work on the projects, thereby admitting a breach of the contract.  *Id.*   The court declined to

excuse FMD's breach on the basis of wrongful termination, or other circumstances which

allegedly may have prevented FMD from performing, because FMD made no such allegations in

its complaint.[1]  *Id.* at 53-54.  The court also found that FMD, through the testimony of two

witnesses, Mr. Franki Gaspar and Mr. Andrew Gaspar, conceded that their calculation of

damages did not account for Baistar's payments made directly to FMD or Baistar's payments to

others to complete the work that FMD did not complete.  *Id.* at 54-55.

Additionally, the court heard and granted Baistar's oral motion to voluntarily dismiss

Counts II and III of the Counter-Complaint, pursuant to Rule 41(c) of the Federal Rules of Civil

Procedure, without objection.  *Id.* at 59-60.

The court then resumed the bench trial with respect to Count I of the Counter-Complaint,

the Sheridan Project.  *Id.*  In Count I of the Counter-Complaint, Baistar alleged, *inter alia*, that

after it paid FMD to work on the Sheridan Project, FMD failed to perform work, including

"demolition, framing, ceiling and drywall, installations of fire doors, painting, flooring, kitchen

installation (design/build), plumbing (labor only) electrical (labor only), piping insulation (labor

only), wall insulation, bedroom/closets door installations (labor only), installation of hand rail(s)

(handicap), and construction of two spa rooms."  Counter-Complaint, ¶ 29; *see generally*, *id*. ¶¶

12-32.  Baistar alleges that it either performed these tasks at Baistar's expense or retained

subcontractors at an expense of approximately $340,000.  *Id.* at 30.

At the close of Baistar's case-in-chief, the court heard FMD's oral Rule 52(c) Motion for

Judgment as Matter of Law, and denied the motion because the court found that FMD had not

carried its burden to show that no evidence had been offered from which a trier of fact could find

---

[1] FMD's counsel conceded that the only allegation with respect to a breach is the allegation that Baistar did not fully pay.  Thus, there was no allegation that the contract was wrongfully terminated, or that Baistar or others prevented FMD from completing the work.  Trial Tr. vol. 2, 54: 5-11.

in favor of Baistar.  Trial Tr. vol. 3, 79:12-25, 80:1-2.  On May 23, 2014, the court heard closing

arguments and the bench trial concluded.  5/23/2014 Minute Entry; *see generally* Trial Tr. vol. 4,

ECF No. 37.  The parties filed proposed findings of fact and conclusions of law in accordance

with the court's scheduling orders. [2]

 Upon consideration of the evidence offered at the trial; the parties' proposed findings of

fact and conclusions of law, and the entire record herein, the court finds that FMD breached the

subcontract with Baistar for the Sheridan Project by failing to meet the milestone deadlines.

However, on the basis of the findings and conclusions set forth in detail herein, the undersigned

finds that Baistar failed to prove actual damages.

# I. FINDINGS OF FACT[3]

## A.  The Miller Act

 The court finds that it has jurisdiction over this action pursuant to the Miller Act., 40

U.S.C. § 3131, *et seq*.  "The Miller Act requires a payment and performance bond on all federal

government construction projects costing over $100,000."  *Window Specialists, Inc. v. Forney*

*Enterprises, Inc.*, 106 F. Supp. 3d 64, 69 (D.D.C. 2015).  The Miller Act provides, in pertinent

part, that "a general contractor on a federal construction project must furnish a payment bond to

protect the labor and materials suppliers."  *U.S. ex rel. Tennessee Valley Marble Holding Co. v.*

*Grunley Const.*, 433 F. Supp. 2d 104, 114 (D.D.C. 2006) (citing 40 U.S.C. § 3131(b)(2)).  "To

state a valid Miller Act claim, a plaintiff must prove essentially two elements: (1) it has

---

[2] *See* Baistar's Proposed Findings, ECF No. 39; FMD's Proposed Findings, ECF No. 40, and Baistar's Reply to
FMD's Proposed Findings, ECF No. 43.

[3] The court will refer to each day's transcript by the applicable witness' name, volume number, page number, and
lines. The court will separate page and line references by a colon.  For example, the court will cite to the transcript
of the first day, for example, as "F. Gaspar Test., Trial Tr. vol. 1, 13: 2."  The court will cite Defendant and Counter-
Complainant Baistar's exhibits as "Baistar Ex.", and Plaintiff and Counter-Defendant FMD's exhibits as "FMD Ex."

'furnished labor or material in carrying out work provided for in a contract for which a payment

bond is furnished under section 3131'; and (2) it 'has not been paid in full within 90 days.'"  *Id*.

(citing 40 U.S.C. § 3133(b)(1)).  The court finds that FMD stated a valid Miller Act claim and

thus retains supplemental jurisdiction over the claims in Baistar's Counter-Complaint.  Fed. R.

Civ. P. 13(a).[4]

### B.  Scope of Contract for Work on the Sheridan Project

1.  Baistar was a party to a construction contract with the United States Department of

Treasury, Bureau of Public Debt, for Grounds Maintenance and Snow Removal Services at the

AFRH in the District of Columbia.  Counter-Complaint ¶ 3; s*ee generally* HK Jun Test., Trial Tr.

vol. 2, 61- 64, 67; Baistar Ex. 28.

2.  Between 2008 and 2012, Baistar and FMD entered into various subcontracts requiring

FMD to perform construction.  Jun Test., Trial Tr. vol. 2, 65: 6 -13.

3.  One of the subcontracts was a 2012 subcontract for FMD to perform construction work

for the Sheridan Project at the AFRH.  Stipulated Contract Proposal, FMD Ex. 58; Trial Tr. vol.

4, 39:11-25.

4.  Mr. Jun testified that he provided detailed specifications for the Sheridan Project to FMD.

Jun Test., Trial Tr. vol. 2, 68: 14-25; Def.'s Ex. 28; 29.  Mr. Jun also testified that he provided

detailed drawings for the Sheridan Project to FMD.  *Id*. at 73: 16-25; Baistar Ex. 31; Baistar Ex.

44.

5.  The proposal included (1) the scope of FMD's work on the Sheridan Project, as

"demolition[,]" "new work[,]" "flooring & tile[,]" and "paint[,]" for "2 level" and "3 level[,]"

---

[4] The parties submitted supplemental briefs with respect to this court's jurisdiction over Count I of Baistar's
Counter-Complaint.  *See* Defendant Baistar Mechanical Inc.'s Response to Court's Order to Show Cause, Dated
February 12th, 2016, ECF. No. 46; Plaintiff's Response to the Issue Raised by the Court as to Subject Matter
Jurisdiction over the State Based Claim, ECF No. 47.

"mechanical & P" and "electrical [,]" and (2) provided that Baistar would pay FMD $331,360.00 for its performance.  FMD Ex. 58.

6.  "Demolition" refers to "remov[al] of objects that are . . . not necessary anymore in order to [create] space to do new work."  Franki Gaspar Test., Tr. vol. 1, 118: 7-11.

7.  Mr. Franki Gaspar testified that "New work" means "installation of new work according to drawings."  Franki Gaspar Test., Tr. vol. 1, 118:15.   He explained that "New work" refers to the "redesign [of] rooms, hallway, and bathroom."  Franki Gaspar Test., Tr. vol. 1, 118: 18.

8.  "New work" also includes "rebuild[ing] and redo[ing] new work."  It depends on the "state on the drawing."  Franki Gaspar Test., Tr. vol. 1, 118: 21-23.

9.  The subcontract provided that FMD would "furnish material and labor – complete in accordance with above specifications," for the sum of $331,360.  FMD Ex. 58; Franki Gaspar Test., Tr. vol. 1, 118: 4-6.

10. The subcontract included three options: (1) "Hallway 3032 New Acc. Ceiling, $4,350"; (2) "Floor NewTile $4,800"; and (3) "handrail Hallway per level $ 5,450.00."  *Id.*

11. Baistar concedes that the cost of installing option (3), "[H]andrail Hallway per level $ 5,450.00," was not within the scope of the contract.  Trial Tr. vol. 4, 95: 19-25, 96:1-4.

12. The parties increased the scope of FMD's work on the Sheridan Project to include "core drilling" of "21 holes at various sizes[.]"  FMD Ex. 59.

13. Baistar agreed to pay FMD $4,300 for the core drilling work.  *Id.*; *see also* F. Gaspar Test., Trial Tr. vol. 1, 119: 21-25, 120: 1-2.

14. The price for core drilling included all material, labor, equipment, supervision, and cleanup.  FMD Ex. 59.

15. The parties disagree with respect to whether FMD was required to provide kitchen cabinets as part of its responsibilities under the Sheridan Project subcontract and offered conflicting testimony.

16. Mr. Franki Gaspar testified that millwork included "handrailing," benches, "the kitchen area," and "all cabinets[.]"  F. Gaspar Test., Trial Tr. vol. 3, 97: 5-8.

17. Mr. Franki Gaspar testified that Baistar reduced the subcontract and eliminated all millwork.  F. Gaspar Test., Trial Tr. vol. 3, 91: 5-8.  Mr. Andrew Gaspar testified that when FMD began work on the Sheridan Project, "it was known to [him] that the millwork was not included in FMD's proposal[,]" or in [their] scope of work.  A. Gaspar Test., Trial Tr. vol. 3, 136: 2-8.

18. Mr. Andrew Gaspar testified that his father, Mr. Franki Gaspar, later discussed millwork with Mr. Jun.  Mr. Andrew Gaspar said that he was not present during the discussions, but later was told by his father "to help out with the setup for the kitchen cabinets as far as shop drawings and so forth."  A. Gaspar Test., Trial Tr. vol. 3, 136:11-16.  Mr. Andrew Gaspar testified that he gave the shop drawings to Mr. Brice Roberson of Baistar; that FMD did not install any kitchen cabinets, and never heard back from Baistar about the shop drawings.  A. Gaspar Test., Trial Tr. vol. 3, 136:19-21, 137: 1-6.  Mr. Andrew Gaspar acknowledged that FMD did not have the kitchen cabinetry and countertops that Baistar needed for the Sheridan Project, and explained that they were not included in the proposal.   A. Gaspar Test., Trial Tr. vol. 3, 138:18-25.

19. Mr. Jun testified that as of mid-September 2012, Mr. Franki Gaspar did not know about the proposed work on the kitchen and responded to Mr. Jun's inquiry about the kitchen drawings by asking "what kitchen?"  Jun Test., Trial Tr. vol. 2, 92:18-23, 93: 3-14.

20. Mr. Jun testified that kitchen cabinets were included in the specifications and that the cabinets were not a substitute for millwork.  Mr. Jun explained that "millwork and kitchen cabinets are a little different. . . . But kitchen cabinets from Home Depot, these are cabinets you just buy, you install.  There's really not much millwork involved."  Jun Test., Trial Tr. vol. 3, 159:15-23.

21. The parties also disagree with respect to whether FMD was required to provide fire doors as part of its responsibilities under the Sheridan Project subcontract and offered conflicting testimony.

22. Mr. Jun testified that fire doors were within the scope of FMD's subcontract for the Sheridan Project.  Jun Test., Trial Tr. vol. 2, 109:15-16, 160:14.

23. Mr. Jun testified, upon cross-examination, that he purchased most of the materials including "all the doors . . .  all the tiles, spas, sinks, toilets, all the connections, lights, everything." Jun Test., Trial Tr. vol. 3, 39:5-8.

24. Mr. Franki Gaspar testified that it was Mr. Jun's responsibility to purchase the fire doors and that FMD agreed to install the fire doors but not to purchase them.  F. Gaspar Test., Trial Tr. vol. 3, 101:18-25, 102:1-13, 104:8-25, 105:1-2.   Mr. Franki Gaspar testified, upon cross-examination by Baistar's counsel, that FMD excluded "doors, hardware fixtures, included downstairs," from the agreement.  F. Gaspar Test., Trial Tr. vol. 3, 115:9-19.  Mr. Franki Gaspar testified that although FMD Exhibit 58 does not mention the exclusions, there was no provision that FMD would provide doors.  F. Gaspar Test., Trial Tr. vol. 3, 116:11-15.  Mr. Andrew Gaspar testified, upon cross-examination by counsel for Baistar, that "[f]ire doors were not installed because I asked Baistar over and over again to disconnect the fire alarms, which they did not do, so it didn't get done."  A. Gaspar Test., Trial Tr. vol. 1, 190:19-22.

25. Mr. Jun testified that on September 15, 2012, on behalf of Baistar, he emailed to Mr.

Andrew Gasper a signed proposal and contract, which included the provision that that the

"project completion date is 12/31/12."  Baistar Ex. 41; FMD Ex. 73; *see* Jun Test., Trial Tr. vol.

2, 82: 3-5, 87: 21-24, 88:9.  Mr. Jun explained that he included the date of December 31, 2012 in

the e-mail to "see a reaction.  Real contractors would say no, that's too hard, give me some more.

So there was nothing.  So I would think they can do it from the previous resume they had given

me.  I mean, they [entered a bid] to Clark, Whiting-Turner.  If they didn't, they would say this is

too short or something to that effect."  Jun Test., Trial Tr. vol. 2, 88:15-21.

### C.  FMD's Performance on the Sheridan Project

26. By a September 15, 2012 email to Mr. Andrew Gaspar, Mr. Jun advised that "[t]he

project completion date is 12/31/12."  FMD Ex. 73.

27. Mr. Andrew Gaspar conceded that neither he nor Mr. Franki Gaspar replied to the e-mail

from Mr. Jun in which Mr. Jun stated that the completion date was December 31, 2012, and

testified that the response was "probably verbal."  A. Gasper Test., Trial Tr. vol. 1, 187: 11.  Mr.

Andrew Gaspar explained that "most of the communication was done verbally, so if you don't

see an e-mail response, it might be likely that I responded verbally."  A. Gasper Test., Trial Tr.

vol. 1, 193: 12-14.

28. FMD stipulated that the subcontract at issue for the Sheridan Project is FMD Exhibit 58.

Trial Tr. vol. 4:10-25.  Although the subcontract for the Sheridan Project was dated August 6,

2012, Baistar did not endorse the contract until November 6, 2012.  *See* FMD Ex. 58.

29. Mr. Jun testified that FMD began work on the Sheridan Project in October 2012.  Jun.

Test., Trial Tr. vol. 2, 84:20-24, 88: 5-9.

30. Baistar responded to a Request for Information ("RFI") from FMD dated October 19, 2012. Jun Test., Trial Tr. vol. 2, 85:3-8. Mr. Jun testified that the RFI deals with "a shutdown schedule, plumbing shutdown schedule, [and] the discrepancies in the drawings and specifications[.]" Jun Test., Trial Tr. vol. 2, 85:8-10. He explained that the RFI contains questions that would come from bidding, not after "we did the construction." Jun Test., Trial Tr. vol. 2, 85:10-12. Mr. Jun further testified that FMD's RFI "questions would have been answered by Baistar during the bidding when they reviewed the documents, if they reviewed the documents." Jun Test., Trial Tr. vol. 2, 85:12-14. [5]

31. On December 14, 2012, Baistar, through Mr. Jun, sent an e-mail to Franki and Andrew Gaspar noting that "the demolition is not complete[,]" and asked FMD to "provide more man power to complete the demolition[,]" in order to "keep up with the [December 31, 2012] schedule." Baistar Ex. 38; Jun Test., Trial Tr. vol. 2, 91:1-16.

32. Mr. Jun testified that in January 2013, Baistar paid FMD approximately $80,000 to "mobilize and finish the job." Jun Test., Trial Tr. vol. 2, 94:1-4.

33. On January 6, 2013, Baistar, through Mr. Jun, sent an e-mail, with the subject line "3rd notice: [S]heridan kitchen layout and vendor[,]" to Frank and Andrew Gaspar. Baistar Ex. 43. In that email, Mr. Jun stated: "When can I expect to have the kitchen layout and discuss with design/supplier? Please let me know by Monday and the resolution no later than Wednesday." *Id*. Mr. Jun also stated that if FMD did not meet the resolution deadline that Baistar would subcontract the work "to another contractor and deduct the cost from the contract[.]" *Id*.

---

[5] FMD claims that Baistar's responses to the RFI are evidence of Baistar's concurrent delay of the Sheridan Project because some of the materials or information required to complete the project were not scheduled to arrive or be available until after December 31, 2012. FMD's Proposed Findings, ¶¶ 7-9.

34. Mr. Jun testified that FMD's performance was deficient, and that as of mid-January 2013, FMD had not even completed "rough-ins," measurements of piping and electrical conduits necessary for build-out walls and floors.  Jun Test., Trial Tr. vol. 2, 94: 11-13, 94: 23-15, 95:1-6.

35. In mid-January, Baistar provided FMD with a "punch list" of outstanding tasks.  Jun Test., Trial Tr. vol. 2, 94: 13-15; Baistar Ex. 47.

36. On January 14, 2013, a "walk through" of the Sheridan Project site by representatives of Baistar and FMD revealed deficiencies, as reflected in the "punch list," in FMD's performance of demolition, ductwork, insulation, and other tasks.  Baistar Ex. 47; Jun Test., Trial Tr. vol. 2, 97: 10-16.

37. Late in January 2013, Baistar received the kitchen layout from FMD.  Jun Test., Trial Tr. vol. 2, 95: 22-25.

### D.  FMD's Alleged Failure to Cure Deficiencies; Termination by Baistar

38. On January 29, 2013, FMD, through Mr. Andrew Gaspar, responded to an e-mail from Brice Roberson, a Baistar representative.  Mr. Roberson, on behalf of Baistar, indicated that FMD must complete the remaining work "by Thursday the 31st 2013."  FMD Ex. 70; *see also* A. Gaspar Test., Trial Tr. vol. 3, 136:22.   Mr. Roberson also stated that "[r]esidents are moving in on March 1st. [E]verything needs to be operational with 100% completion by Thursday February 28th."  *Id*.

39. FMD, in its response did not dispute the schedule; rather, FMD stated that it "can schedule shutdown for plumbing [on] Thursday[.]" *Id*.

40. Mr. Jun testified that "approaching the beginning of February, FMD had performed only "maybe 30, 40 percent" of the Sheridan Contract.  Jun Test., Trial Tr. vol. 2, 105:1-3.  Mr. Jun testified that as of February 1, 2013, the "[k]itchen was not done. . . . demolition was done, but

it's completely empty.   All floors had been demoed, it's in demon condition.   Laundry room, spa

rooms, they are all in demo condition, not complete with the demo." Jun Test., Trial Tr. vol. 2,

106: 9-14.   He testified that FMD "didn't even purchase for any shop drawings or any kind of

handrailing shop drawings or anything."   He testified that it looked "like the middle of [a]

construction site," "nothing in [there was] complete a hundred percent[,]" and "[f]loor tiles . . .

never touched on both floors."   *Id*. at 106:15-18, 21-25.   He further testified that the painting was

not done and that "[n]ew work was maybe 50 percent, 40 percent done, I don't know."  Id. at

107:2-3.   Finally, he testified that FMD did not "[i]nstall six TVs" and that the mechanical and

electrical work was not done.  *Id*. at 107:4-9.

41. On February 1, 2013, Baistar terminated FMD for cause.  Jun Test., Trial Tr. vol. 2, 107:

12; *see also* Baistar Ex. 55.   Counsel for Baistar stated that in the termination letter that "FMD

was put on notice that the subcontractor shall be liable for any damage to the contractor resulting

from the contractor's refusal or failure to complete the work within the specified time, whether

or not the subcontractor's right to proceed with the work is terminated." Trial Tr. vol. 4, 93:12.

42. Mr. Jun testified that Baistar terminated FMD's subcontract in order "to protect [his]

company financially and [his] clients' interests and to be able to provide [and] deliver what

[they] promised in the contract to the owner and [for] all soldiers to be able to move in on time."

Jun Test., Trial Tr. vol. 2, 104:22-25.   Mr. Jun further testified that the tenants' move-in date was

subsequently delayed from March 1, 2013 to April 1, 2013.  Jun Test., Trial Tr. vol. 3, 50: 9-13.

43. Mr. Andrew Gaspar acknowledged that FMD, as of the date of the termination, had not

completed certain tasks including "minor drywall, some plumbing, a bit of electrical, and some

flooring."  A. Gaspar Test., Tr. Tr. vol. 1, 189:14-25.  He also acknowledged that the floor and

tile work were not done and that the kitchen, two spa rooms, fire doors, and a laundry room were

not installed. *Id.* at 190:1-18.  Mr. Andrew Gaspar testified that FMD "did framing," and

"ceiling;" as FMD was scheduled for shutdown the following Monday after FMD was

terminated[,] for the plumbing for the laundry room[;]" and  that FMD was not "supposed to

furnish equipment for the laundry room." *Id.* at 190:13-18.  With regard to a punch list of

required corrections that Baistar provided on January 14, 2013, Mr. Andrew Gaspar testified that

FMD "complete[d] the majority of the punch list" and anything that FMD did not complete was

because FMD "couldn't for a reason that [FMD] could not control."  A. Gaspar Test., Trial Tr.

vol. 3, 140:11-14.

44. Mr. Andrew Gaspar testified that any delays in meeting Baistar's scheduling deadlines

were a result of Baistar's failure to articulate a deadline from the outset; Baistar's impossible

demands; Baistar's failure to provide answers, and holdups from other contractors.  A. Gaspar

Test., Trial Tr. vol. 3, 137:8-23.

45. Mr. Andrew Gaspar testified that before Baistar paid any invoice from FMD, Mr. Jun

performed a walk-through with Mr. Andrew Gaspar, in order to determine whether Baistar

would approve and pay the invoice.  A. Gaspar Test., Trial Tr. vol. 3, 138:11-13.

**E.  Replacement Subcontractors for the Sheridan Project**

46. Mr. Jun testified that Baistar contracted with Mega Construction to do replacement work

on the project during February and March, 2013.  Jun Trial Test., Tr. vol. 2, 107: 21-25.  Mr. Jun

testified that Baistar did not have a written agreement with Mega Construction that describes the

scope of work for the Sheridan Project because he "was under the gun" and "did not have time to

sign [and] review contracts."  Jun Test., Trial Tr. vol. 2, 154:14-19.

47. Mr. Jun testified that Mega Construction finished the majority of the work, including the

kitchen and spa rooms.  Jun Test., Trial Tr. vol. 2, 107: 21-25.  Mr. Jun explained that because

Mega Construction charged more than a smaller company for "finishing, touchups, [and] finish details," he asked Israel Cruz whether he could "finish the job as well[.]"  Jun Test., Trial Tr. vol. 2, 108: 11-19.

48. Baistar did not call a witness from Mega Construction to testify during the trial.

49. Baistar offered copies of cancelled checks to Mega Construction as evidence that it paid Mega Construction for replacement work.  Baistar Ex. 60; *see also* Baistar (Demonstrative) Ex. 62.[6]  The cancelled checks bore no entry reflecting the goods or services for which payment was made.

50. Mr. Jun testified that Baistar also contracted with Israel Cruz and his company, Delmy Construction, to perform replacement work on the project in March, 2013.  Jun Test., Tr. vol. 2, 108: 20-23;  *see also* Cruz Test., Tr. vol. 2, 123:12-22, 132:17-18, 137: 11-13; 139.

51. Baistar offered a copy of the "agreement" with Israel Cruz, as well as invoices from Israel Cruz/Delmy Construction, and ten cancelled checks reflecting payment in the amount of $63, 228.10.  Baistar Ex. 59; Baistar (Demonstrative) Ex. 62.

52. The agreement between Baistar and Israel Cruz/Delmy General Construction required Israel Cruz/Delmy Construction to perform "plumbing of two bathrooms on the second and third floors"; "[d]ry wall, painting, and flooring in both bathrooms"; "[i]nstallation of two gas fireplaces on the third and second floors"; "[c]onnection of a steam table"; "[c]onnection and installation of a lavatory"; "[i]nstallation of six double doors (no wires or electrical job)[,]" and "[i]nstallation of two double doors in closets and one double door in hallway."  *See* Agreement, Baistar Ex. 59.

---

[6]  Baistar Exhibit 62, a summary of Baistar's payments to FMD and the replacement contractors, was received solely for demonstrative purposes.  Trial Tr. vol. 3, 48: 18-20.  FMD did not stipulate to the accuracy of the document.  *Id*. at 21-22.

53. Mr. Cruz of Delmy Construction testified on behalf of Baistar and was cross-examined by counsel for FMD.  *See* Cruz Test., Trial Tr. vol. 2, 110-139.

54.   Mr. Cruz testified that he performs "general work," and that he "particularly work[s] in plumbing." Cruz Test., Trial Tr. vol. 2, 112: 16-20.  Mr. Cruz performed construction work for FMD for about six to eight months.  *Id*. at 112: 24.  Mr. Cruz uses the company name Delmy General Construction, Inc.  *Id*. at 113:15.  Mr. Cruz testified that when he worked on the Eagle Gate AFRH Project with FMD, he did not have a contract and only "worked some days helping [FMD] a few hours."  *Id*. at 123:16-17.

55.  Baistar contacted Mr. Cruz to ask whether he could work on the Sheridan Project.  Cruz Test., Trial Tr. vol. 2, 124:4-6.  Mr. Cruz began work for Baistar on the Sheridan Project in March, 2013.  *Id*. at 126:1-4.

56. Mr. Cruz testified that "[he] did painting[,] . . . [i]nstalled fireproof doors[,] . . . fixed framing and . . . installed drywall[,]" for Baistar on the Sheridan Project.  Cruz Test., Trial Tr. vol. 2, 132:17-18.   He testified that he drained the water pipes, and installed various fixtures in rooms where there were toilets, basins, and Jacuzzis.  *See* Cruz Test., Trial Tr. vol. 2, 137:8-13.  He testified that he installed ADA-compliant bathrooms.  *Id*. at 137:14.  He further testified that "with regard to the f[ire] doors, [he] worked with the frames for the f[ire] doors because they were not functional" and that he installed the drywall.  *Id*. at 137: 18-20.  He also testified that he installed the doors, painted them, installed the locks and completed the wiring for the control.  *Id*. at 137: 20-22.  Mr. Cruz testified that he installed the handrails in the hallways and the corresponding base.  *Id*. at 138:2-3.  Mr. Cruz testified that he worked on four bathrooms and our bedrooms in the Sheridan building.  *Id*. at 138:7-11.  He further testifies that he did "100 percent" of the work as "there was nothing there."  *Id*. at 138:13.  He testified that he did the

framing, "drywalling," painting, the baseboard and the doors.  *Id*. at 138: 14-15.  He also testified

that he fixed some pipes that were leaking, and others that needed insulation.  *Id*. at 138: 21-22.

He also testified that he cut some drywall to make some repairs that were also needed to finish

the installation.  *Id*. at 138: 22-24.  Finally, Mr. Cruz testified that Baistar purchased the doors

and materials.  *Id*. at 137:23-24, 138:5-6.

57. Mr. Cruz testified that $86,500 in invoices for the Sheridan Project were tendered to

Baistar from March 2013 to August 2013, and that Baistar paid all of them.  *Id*. at 117:25, 118:1-

5; Agreement, Baistar Ex. 59.

58. Mr. Cruz testified that he was not privy to the contract between FMD and Baistar, for the

Sheridan Project, and that he just performed work on the plans as directed by Baistar.  *Id*. at 136:

1-25, 137:1.

59. Finally, Mr. Jun testified that Baistar contracted with Dominion Millwork, a kitchen

design build company, to complete the design and installation of the kitchens that FMD did not

install.  Jun Test., Tr. vol. 2, 109: 24-25, 110:1-4.

60. Counsel for Baistar did not call a witness from Dominion Millwork to testify during the

trial; nor did he offer the agreement between Dominion Millwork and Baistar.  Rather, counsel

for Baistar offered as demonstrative exhibit, a summary of Dominion Millwork payments, to

support his proffer that Baistar paid $50,000 to Dominion Millwork for replacement work.  Trial

Tr. vol. 4, 31:11-17.

### F.   Costs, Billing, and Payments

61. Baistar and FMD agreed on a framework for calculating damages: the contract price for

the Sheridan Project (A) minus the total amount paid to FMD for the Sheridan Project (B) equals

the cost avoided by termination (C); once the court determines the replacement costs (D), then

the amount of damages for the breach, (E), would be the cost avoided (C), minus or plus the replacement costs, if they exceed that.  Trial Tr. vol. 4, 2: 17-25, 4: 3-20; *see also* Joint Ex. A.

62. Mr. Jun testified that Baistar paid FMD a total of $199,449.00 for work on the Sheridan Project, prior to termination, as follows: $33,000 on November 6, 2012, $83,949 on December 5, 2012 and $82,500 on January 8, 2013.  Jun Test., Trial Tr. vol. 2, 145:18, 146: 1-14; *see also* Def.'s Ex. 58; Def.'s Ex. 62.

63. The replacement costs that Baistar claims consists of payments that Baistar made to Mega Construction, Israel Cruz/Delmy Construction and Dominion Millwork.  Trial Tr. vol. 4. 4; 11-15.

64. Mr. Jun testified that Baistar paid a total of $305,500 to the replacement subcontractors as follows: $169,000 to Mega Construction, $86,500 to Israel Cruz/Delmy Construction, and $50,000 to Dominion Millwork.   Jun Test., Trial Tr. vol. 3, 51:15-16; Baistar Ex. 59; Baistar (Demonstrative) Ex. 62; *see also* Cruz Test., Trial Tr. vol. 2, 117; 25, 118, 1-5.

65. Baistar's cost avoided by terminating FMD's subcontract was $132,911.  Trial Tr. vol. 4, 34, at lines 3-8.

66. Mr. Jun testified that Baistar incurred $82,300 in material costs for materials he believed were within the scope of FMD's subcontract, consisting of fire doors, light fixtures, paint, floor tiles, drywall, framing, handrails, and electrical fixtures.  Jun Test., Trial Tr. vol. 2, 160-62, 164.

67. Mr. Jun testified that the fire doors cost Baistar approximately $25,000.  Jun Test., Trial Tr. vol. 2, 160: 23-24.

## II.    CONCLUSIONS OF LAW

### A.  Liability for Breach of Contract

A litigant must prove each element of a breach of contract claim by a preponderance of the evidence. *Window Specialists, Inc.*, 106 F. Supp. 3d at 88; *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Service,* 885 F. Supp. 2d 156, 181 (D.D.C. 2012). The preponderance standard requires the factfinder to determine that the existence of a fact is more probable than its nonexistence. *Window Specialists, Inc.*, 106 F. Supp. 3d at 88 (citation omitted). "[T]he factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Id*. (citation omitted).

To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *Window Specialists, Inc.*, 106 F. Supp. 3d at 88; *see also Tsintolas Realty Co. v. Mendez,* 984 A.2d 181, 187 (D.C. 2009). A "breach" is "an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages." *Window Specialists, Inc.*, 106 F. Supp. 3d at 88 (citing *Fowler v. A & A Co.,* 262 A.2d 344, 347 (D.C. 1970)) (citation and quotation marks omitted). A "material" breach is one where the injured party received something substantially less or different from that for which it bargained. *Id*.

Baistar has demonstrated that FMD and Baistar had a valid and binding contract in which FMD agreed to furnish labor and materials as specified in the contract, *see* FMD Ex. 58, for the Sheridan Project in exchange for a contract price of $331,360.00. Baistar terminated FMD for

cause for eight "material defaults[,]" and in this action, FMD does not challenge the termination as wrongful.[7]  FMD Exs. 52-53.

However, the court concludes that Baistar did not offer evidence sufficient to prove by a preponderance of the evidence that FMD was required by the terms of the subcontract to provide millwork and fire doors.  To the extent that millwork was ever discussed by the parties and subsequently removed from FMD's scope of work, the court finds that there was no meeting of minds between the parties regarding whether or not millwork was within the scope of work for the Sheridan Project.  Likewise, Baistar failed to offer evidence sufficient to prove by a preponderance of the evidence that FMD was contractually bound to provide fire doors; indeed, Mr. Cruz testified that Baistar purchased the fire doors that he installed.  Because Baistar has failed to prove by a preponderance of the evidence that FMD was required to provide millwork and fire doors, none of those costs are recoverable in this action.  Accordingly, neither the $50,000 in replacement costs that Baistar claims it paid to Dominion Millwork, nor the cost of the fire doors, is recoverable.

### B.  Damages for the Breach of Contract Proven by a Preponderance of the Evidence

Where a party fails to complete work that it agreed to perform under a contract, the non-breaching party is entitled to receive the cost to complete the work, to the extent that amount exceeds the original contract price.  *Window Specialists*, *Inc*., 106 F. Supp. 3d at 92 (citing *Rowan Heating–Air Conditioning–Sheet Metal v. Williams,* 580 A.2d 583, 585 (D.C. 1990)). "While a litigant need not prove damages with mathematical certainty, he must prove some reasonable basis upon which damages may be estimated."  *Window Specialists*, *Inc*., 106 F.

---

[7] Indeed, FMD conceded that as of the date of termination, it had not completed the work which it regarded as within the scope of the contract.  *See* A. Gaspar Test., Tr. Tr. vol. 1, 189:14-25, 190:1-22.

Supp. 3d at 22; *Mashack v. Superior Mgmt. Servs., Inc.,* 806 A.2d 1239, 1241–42 (D.C. 2002);

*Garcia v. Llerena,* 599 A.2d 1138, 1142 (D.C. 1991).  "[D]amages cannot be awarded on the

basis of mere speculation or guesswork."  *Window Specialists*, *Inc*., 106 F. Supp. 3d at 92

(citation and internal quotation marks omitted).   "If a party establishes a breach of contract but

fails to demonstrate actual damages, or its proof of damages is vague or speculative, the party is

entitled to no more than nominal damages."  *Window Specialists*, *Inc*., 106 F. Supp. 3d at 92; *see*

*also FCE Benefit Adm'rs, Inc. v. George Washington Univ*., 209 F. Supp. 2d 232, 243 (D.D.C.

2002); *Cahn v. Antioch Univ.,* 482 A.2d 120, 120 (D.C. 1984).

      Between November 6, 2012 and January 8, 2013, Baistar paid a total $199,449.00 to

FMD for work on the Sheridan Project.  The cost avoided by terminating the subcontract with

FMD was the contract price, $331,360.00, minus amount paid to FMD, $199,449.00, which

leaves a difference of $131,911.  Baistar claims that it paid the replacement contractors a total of

$305,500.  Baistar also claims that it paid $82,300 for materials that were within the scope of

FMD's subcontract.  In his closing statements, counsel for Baistar conceded that the sum of

$20,900 should be deducted from the amount of the replacement costs to account for materials

($10,000), and labor ($10,900).  Trial Tr. vol. 4, 96; 6-14.

      The court concludes that under the parties' framework, Baistar's alleged damages for

FMD's breach would be the replacement costs ($387,800), minus the costs avoided ($132,911), a

difference of $254,889.00.  *See* Joint Ex. A.  As conceded by Baistar's counsel, the court will

deduct the sum of $20,900 from the claimed replacement costs.  The court will deduct the cost of

fire doors, $25,000, because the court has concluded that Baistar failed to prove by a

preponderance of the evidence that FMD was required to furnish them.  For the same reasons,

the court will deduct from the claimed replacement costs the $50,000 paid to Dominion

Millwork.  Finally, as the court has found that Baistar failed to prove by a preponderance of the

evidence that the materials supplied and work performed by Mega Construction were within the

scope of FMD's requirements, no amount will be awarded for such supplies and work.

Although Baistar claims that it paid Israel Cruz $86,500 for replacement work, Baistar

submitted ten cancelled checks totaling $63,228.10 as evidence of the payment.  Baistar Ex. 59.

68. Using the parties' framework, the court calculates the recoverable replacement costs for

the Sheridan Project to be the cost that Baistar incurred for materials ($82,300), minus the

($20,900) which Baistar asked the court to subtract, and the cost of fire doors ($25,000), plus the

$63,228.10 that Baistar paid to Israel Cruz, which equals $ 99,628.10.  The court's damages

calculation (E), using the parties' framework, is the recoverable replacement costs of $99,628.10

(D) minus the costs avoided $132,911 (C) which equals - $33,282.90.

69. Accordingly, the Court finds, using the parties' framework, Joint Ex. A, that Baistar's

damages from FMD's breach of the Sheridan Project subcontract equals the cost of the

replacement labor and materials, minus the cost avoided, which here equals - $33,282.90.  *See*

Trial Tr. vol. 4, 34, at lines 3-8.  As this amount is less than the cost avoided, the court concludes

that Baistar has failed to demonstrate actual damages.  *See Window Specialists*, *Inc*., 106 F.

Supp. 3d at 92 ("If a party establishes a breach of contract but fails to demonstrate actual

damages, or its proof of damages is vague or speculative, the party is entitled to no more than

nominal damages.").  The court, upon consideration of this calculation in the context of the

applicable authorities, awards Baistar nominal damages of $1.00.  *See id*. at 96.

## III.   CONCLUSION

FMD breached the Sheridan Assisted Living Center subcontract and is therefore liable to

Baistar for the cost of replacement labor and materials minus the cost avoided by terminating the

contract.  On the basis of the findings of fact and conclusions of law set forth herein, the

undersigned finds that Baistar has failed to prove by a preponderance of the evidence more than

nominal damages.  Judgment will be entered in favor of Baistar.  An Order of Final Judgment,

memorializing the court's determination, accompanies this Opinion.


                                                    /s/
                                        DEBORAH A. ROBINSON
                                        United States Magistrate Judge


June 21, 2016